# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF DELAWARE

UNITED STATES OF AMERICA,    )
                                  )

        Plaintiff,    )
                                  )

    v.    )    Crim. No. 22-017-4-CFC
                                  )

DWAYNE ALEXANDER,    )
                                  )

        Defendant.    )

## MEMORANDUM ORDER

Pending before me is Defendant Dwayne Alexander's posttrial motion for a judgment of acquittal or a new trial. D.I. 364. A jury found Alexander guilty of Counts I and II of the Third Superseding Indictment (the Indictment) on June 5, 2025.

Count I of the Indictment charged Alexander with conspiracy to commit kidnapping in violation of 18 U.S.C. § 1201(a)(1) and (c). Count II charged him with kidnapping resulting in death and aiding-and-abetting the same, in violation of 18 U.S.C. §§ 1201(a)(1) and 2. D.I. 137. The Indictment alleged in relevant part that in furtherance of the commission of the kidnapping conspiracy coconspirators traveled in interstate commerce, used instrumentalities of interstate commerce, and transported the Victim in interstate commerce. D.I. 370 at 1–2. It also alleged in relevant part that in furtherance of the kidnapping that Alexander

was charged with aiding and abetting, Alexander and his codefendant traveled in interstate commerce, used instrumentalities of interstate commerce, and transported the Victim in interstate commerce. The Indictment alleged specifically that coconspirators of Alexander used a Jeep in Delaware to seize the Victim from a residence in Wilmington and then drove the Victim in the Jeep to Philadelphia, where they picked up Alexander, who directed them to an industrial site in Pennsylvania where at least one of the coconspirators shot the Victim in the head and killed him. D.I. 137 at 2; D.I. 364 at 4.

Alexander brings his motion pursuant to Federal Rules of Criminal Procedure 29 and 33. D.I. 364 at 1. Under Rule 29, "the court on the defendant's motion must enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction." Fed. R. Crim. P. 29(a). Under Rule 33, "the court may" "[u]pon the defendant's motion . . . vacate any judgment and grant a new trial if the interest of justice so requires." Fed. R. Crim. P. 33(a).

## I.

Before getting to the merits of the motion, I need to address the government's argument that I should deny the motion as untimely. The government correctly notes that since Alexander's motion is not based on newly discovered evidence, he was required under both Rule 29(c)(1) and Rule 33(b)(2) to file the motion within fourteen days after the verdict. *See* Fed. R. Crim.

2

P. 29(c)(1) ("A defendant may move for a judgment of acquittal, or renew such a motion, within 14 days after a guilty verdict or after the court discharges the jury, whichever is later.");[1] Fed. R. Crim. P. 33(b)(2) ("Any motion for a new trial grounded on any reason other than newly discovered evidence must be filed within 14 days after the verdict or finding of guilty."). In the government's view, because Alexander did not file his motion before the expiration of the fourteen-day period or seek an extension under Rule 45(b)(1)(A) during that period, I can entertain the motion under Rule 45(b)(1)(B) only if his failure to timely file the motion was the product of excusable neglect. And according to the government, because Alexander made no attempt to offer an explanation for his late filing, he has forfeited the argument that his late filing was the result of excusable neglect, and I should therefore deny his motion as untimely.

The government's position is not unreasonable, but I will not deny the motion as untimely because of the unusual chain of events that preceded the filing of the motion.

Alexander sent me on June 10, 2025—five days after the verdict and discharge of the jury—two letters. He asked me to "accept" the first letter "as a formal filing of my notice of appeals." D.I. 376 at 1. In the second letter, he stated that he "no longer ha[d] access to fund[s]" and asked if the Court could send him

---

[1] I discharged the jury the same day it returned its verdict.

3

his trial transcripts. D.I. 376 at 3. I did not docket the letters or share them with the government but instead had the Clerk of Court send them on June 23, 2025 to Alexander's Court-appointed counsel. *See* D.I. 293. Less than a month later, Alexander filed a motion to replace his counsel. D.I. 300.

Alexander had twice before asked me to replace his counsel. But he had withdrawn the previous two requests during hearings I convened to address those requests.

On August 19—the earliest date open on my calendar—I convened a hearing to address this latest request for a new lawyer. Consistent with the professionalism exhibited by his trial counsel throughout these proceedings,[2] counsel stated at the August 19 hearing: "I think there is an inherent conflict if I would represent Mr. Alexander on appeal and try to identify plain error issues, frankly," and that "[a]s much as I fought for him, I understand where he's coming from, and I respect his decision [to seek new counsel]." D.I. 370 at 3–4. Alexander confirmed at the hearing that he wanted new counsel. He also stated that he had brought with him two motions he wished to file pursuant to Rules 29 and 33. D.I. 370 at 4, 8; D.I. 310; D.I. 311. I agreed to docket the motions but also granted the government's request that it did not have to respond to those motions because I

---

[2] As I stated at the August 19 hearing, "it's hard to use a word that would give [Alexander's trial counsel] due credit" for the "outstanding job [he did] in a very difficult case." D.I. 370 at 7.

4

was going to appoint new counsel for Alexander and allow new counsel the opportunity to file a Rule 29 and/or Rule 33 motion. D.I. 370 at 15–16. I docketed the motions that day. D.I. 310; D.I. 311.

The next day, I appointed new counsel for Alexander. Shortly thereafter, new counsel informed the government that he would be filing one or more posttrial motions. *See* D.I. 314 at 2. That prompted the government on September 9, 2025 to move for a continuance of Alexander's sentencing. D.I. 314 at 2. I granted the government motion and set a new sentencing date of January 27, 2026. D.I. 315. New counsel thereafter filed two motions—each unopposed by the government— for extensions to file posttrial motions. I granted both motions, the effect of which gave Alexander until February 10, 2026 to file any posttrial motion. Alexander filed the pending motion on February 6, 2026. D.I. 364.

In light of this unique chronology and the fact that Alexander is facing a mandatory life sentence, I think it appropriate to treat the time between June 5, 2025 and February 6, 2026 as tolled and deem the pending motion as timely filed.

## II.

I turn then to the merits of the motion. Alexander makes three arguments in support of his motion. I address them in turn.

## A.

Alexander argues first that "the Indictment was jurisdictionally defective" because it did not "alleg[e] that the conduct charged had an effect on interstate commerce." D.I. 364 at 7; *see also* D.I. 364 at 4, 6. (Alexander erroneously frames his argument as "jurisdictional." "[D]efects in an indictment do not deprive a court of its power to adjudicate a case." *United States v. Cotton*, 535 U.S. 625, 630 (2002).) Specifically, he argues that the Indictment was defective because it did not allege "a nexus between the Jeep crossing state lines [and] having an effect on interstate commerce." D.I. 364 at 7; *see also* D.I. 364 at 7 ("Alexander's conviction must be vacated because the government neither pled nor proved any interstate nexus regarding the Jeep.").

Alexander had not previously made this argument. Under Rule 12(b)(3)(B), however, the defense of "defect in the indictment" "must be raised by pretrial motion if the basis for the motion is then reasonably available and the motion can be determined without a trial on the merits." Fed. R. Crim. P. 12(b)(3)(B). Accordingly, because the contents of the Indictment were available to Alexander before trial and the question of whether the Indictment alleged that the conduct charged had an effect on interstate commerce could have been determined without a trial on the merits, I may consider his argument now only if the alleged defect in the Indictment constitutes a plain error that affects substantial rights. Fed. R. Crim.

6

P. 52(b) ("A plain error that affects substantial rights may be considered even though it was not brought to the court's attention.").

A plain error is a "'clear' or, equivalently, 'obvious'" error. *United States v. Olano*, 507 U.S. 725, 734 (1993). The alleged defect in the Indictment Alexander points to here was not an error let alone a plain error. Alexander admits, as he must, that the Indictment alleges the three alternative jurisdictional elements in § 1201(a)(1)—namely, that the victim was transported in interstate commerce, that the offender traveled in interstate commerce, and that the offender used an instrumentality of interstate commerce. D.I. 364 at 1–2. And he concedes, as he must, that the Indictment alleges specifically that coconspirators of Alexander used a Jeep in Delaware to seize the Victim from a residence in Wilmington and then drove the Victim in the Jeep to Philadelphia where they picked up Alexander, who directed them to an industrial site in Pennsylvania where the Victim was executed. D.I. 137 at 2; D.I. 364 at 4 ("The Indictment does repeatedly state that a green Jeep Cherokee was driven and provides [a] summation of the itinerary.").

Alexander cites, and I know of, no case that holds that an indictment that pleads that the victim of a kidnapping was driven across state lines but does not plead that that crossing of state lines affected interstate commerce is defective. Alexander points to *United States v. Chavarria*, 140 F.4th 1257 (10th Cir. 2025), in which the Tenth Circuit affirmed the dismissal of an indictment that charged two

7

defendants with kidnapping. *Id.* at 1260–61. The indictment in *Chavarria*, however, alleged that a motor vehicle had been used as an instrumentality of interstate commerce for an intrastate transportation of a kidnapping victim. *Id.* at 1260. In this case, the Indictment alleges specifically that the Victim was transported across states lines in a Jeep.

In general, an indictment is sufficient if "it informs the defendant of the statute he is charged with violating, lists the elements of a violation under the statute, and specifies the time period during which the violations occurred." *United States v. Huet*, 665 F.3d 588, 595 (3d Cir. 2012), *abrogated on other grounds by Rehaif v. United States*, 588 U.S. 225 (2019). The Indictment in this case satisfied all three criteria.

## B.

Alexander next argues that the government failed to adduce evidence at trial sufficient to sustain his conviction for aiding and abetting kidnapping. In assessing this argument, I "review the record in the light most favorable to the prosecution to determine whether any rational trier of fact could have found proof of guilt beyond a reasonable doubt based on the available evidence." *United States v. Kousisis*, 82 F.4th 230, 236 (3d Cir. 2023) (internal quotation marks and citation omitted).

The starting point of Alexander's argument is that "the kidnapping itself only occurred in the District of Delaware." D.I. 364 at 8. But that premise is

8

wrong as a matter of law. Kidnapping "is a unitary crime." *United States v. Rodriguez-Moreno*, 526 U.S. 275, 281 (1999) (citations omitted). Thus, "[a] kidnaping, once begun, does not end until the victim is free" and "[i]t does not make sense . . . to speak of it in discrete geographic fragments." *Id.*

The kidnapping in this case began in Delaware and continued into Pennsylvania. It is undisputed, and overwhelming evidence introduced at trial established, that just after midnight on July 21, 2021, coconspirators Rodney Chambers (nicknamed "Loco2x"), Kimon Burton-Roberson (nicknamed "K-Rocc"), Josiah Rivera (nicknamed "Spazz"), Jamil Salahuddin (nicknamed "Twin"), and Stephanie Bultes-Ramirez (nicknamed "Mamas") drove to a home in Wilmington, Delaware; that Burton-Roberson, Rivera, and Salahuddin entered the home, violently beat the Victim with a pry bar, handcuffed the Victim with zipties, and forced him into the backseat of a Jeep between Burton-Roberson and Salahuddin; that Rivera sat in the front passenger seat; and that the Jeep was driven by Bultes-Ramirez to Pennsylvania where the Victim was shot in the head and killed with an assault rifle.

The government adduced at trial substantial evidence from which a rational jury could conclude that Alexander aided and abetted and conspired to accomplish that kidnapping and killing:

- Chambers testified that as of the time of the kidnapping Chambers, Alexander, Burton-Roberson,

9

Rivera, Salahuddin, and Bultes-Ramirez were members of the Shotgun Crips street gang. According to Chambers: the gang had a hierarchy; Alexander was the head of the gang; Chambers and Burton-Roberson were immediately below and took orders from Alexander; the other gang members were below and took orders from Alexander, Chambers, and Burton-Roberson; and a lower member of the Crips was not allowed to commit an act of violence without first "get[ting] the[] . . . 'Okay'" from the leader of the gang. D.I. 304 at 386–91, 427–28.

- Chambers's testimony about the membership and hierarchy of the gang and Alexander's leadership role in the gang was corroborated by the testimony of coconspirator Salahuddin (D.I. 305 at 684–91, 795–96); the testimony of coconspirator Bultes-Ramirez (D.I. 303 at 144–63); photographs of Alexander, Chambers, and Burton-Roberson and three other men making distinctive Shotgun Crisp hand signals (e.g., Gov't Trial Ex. 42); and the expert testimony of Devon Self about the organization, colors, hand signals, and related attributes of the Crips (D.I. 306 at 1034–55).

- Bultes-Ramirez testified that shortly before the kidnapping Burton-Roberson and the Victim were feuding about the Victim's failure to repay money Burton-Roberson had lent the Victim and that Burton-Roberson "said he was going to get [the Victim] before [the Victim] got him." D.I. 303 at 164. Chambers similarly testified that a few days before the kidnapping Burton-Roberson told him that he "had a problem" with the Victim and "wanted to do something" to the Victim, that on the day of the kidnapping Burton-Roberson said he "wanted to handle" the Victim later that day, and that "Sleepie [i.e., Alexander] said he [Burton-Roberson] had to get it [i.e., handle the Victim] done." D.I. 304 at 395–96. His testimony was further corroborated by a text

10

message sent from Burton-Roberson's phone to Chambers's phone four days before the kidnapping that read: "[The Victim] gotta go[,] I'm running in tha [sic] crib." Gov't Trial Ex. 165 at 3.

- Bultes-Ramirez testified that she drove the Jeep to a home in Philadelphia, that on the way there Burton-Roberson called someone and "let[] them know that he had [the Victim]," that when they arrived at a house in Philadelphia Alexander got in the Jeep and "started telling me where to go, the directions where to go," that she followed those directions and ended up at an industrial park where she parked the Jeep and the men got out of the car and walked the Victim behind some trees and bushes, and that the men returned to Jeep without the Victim. D.I. 303 at 186–94. According to Bultes-Ramirez, after the men returned to the Jeep, she drove it to Alexander's home, and from there an unindicted coconspirator drove Salhuddin and Chambers drove Bultes-Ramirez back to Delaware in separate cars, leaving the Jeep, Burton-Roberson, and Alexander at Alexander's house. D.I. 303 at 194–95.

- Salhuddin testified that when he, Burton-Roberson, and Rivera entered the Wilmington home to kidnap the Victim, Burton-Roberson carried an assault rifle, that he had seen Burton-Roberson with the assault rifle a few days before the kidnapping, and that the rifle was black and "had like a little holographic sight on there with a box drum" and "what looked like to be a suppresser on the front." D.I. 305 at 699.

- Salhuddin testified that on the drive to Philadelphia Burton-Roberson Face-timed Alexander and "t[old] Sleepie [i.e., Alexander] that he was on his way," and that Alexander replied, "All right." D.I. 305 at 704–08. According to Salhuddin, when the Jeep arrived at its destination in Philadelphia, Alexander was "standing outside." D.I. 305 at 708. Saldhuddin

11

testified that at this point, Rivera got out of the Jeep's front passenger seat and walked to a car driven by Chambers from Wilmington, that Salhuddin moved to the front passenger seat, and that Alexander took the right-side backseat Salhuddin had previously occupied. D.I. 305 at 708. Alexander then directed Bultes-Ramirez to drive to an industrial park, where Bultes-Ramirez parked next to Chambers's car. Rivera got out of Chambers's car and helped Salhuddin carry the Victim up a hill where Alexander and Burton-Roberson joined them. Burton-Roberson kicked the Victim in the head, asked him if he had any last words, and then shot and killed him with the assault rifle. D.I. 305 at 711–16.

- Salhuddin testified that immediately after Burton-Roberson shot the Victim, he, Burton-Roberson, and Alexander ran to the Jeep and Rivera ran to Chambers's car. The two cars proceeded to drive to a residence in Philadelphia where Burton-Roberson was staying. On the drive back to Philadelphia, Salhuddin sat in the back seat of the Jeep next to Burton-Roberson with the assault rifle positioned between Salhuddin's right knee and Burton-Roberson's left knee. Salhuddin noticed that the rifle was missing its suppressor. When the Jeep arrived at the residence, Salhuddin got out of the Jeep and walked to the car of an unindicted coconspirator. As he did, he heard Burton-Roberson say, "I got to go back because something['s] missing." D.I. 305 at 713–16.

- Thomas Reynolds testified that on the morning of July 21, 2021, he was a sergeant with the Yeadon Borough Police Department, that Yeadon is adjacent to Philadelphia, and that sometime after 6:30 a.m. that day, police found the Victim's dead body facedown with his hands tied behind his back on the hill of an industrial park located at 6250 Baltimore Pike in Yeadon. D.I. 303 at 124–35.

12

- Salhuddin's testimony that Burton-Roberson Face-timed Alexander in the Jeep on the way from Wilmington to Philadelphia was corroborated by phone records introduced into evidence that show calls from a phone associated with Burton-Roberson to a phone associated with Alexander at 1:32 a.m. and 1:42 a.m. on July 21, 2021.

- Location data from Burton-Roberson's phone show that on July 21, 2021, between 12:43 a.m. and 1:08 a.m. the phone was located in or next to the Wilmington residence from which the Victim was kidnapped; that the phone then traveled to Philadelphia and arrived in the vicinity of Alexander's residence at approximately 1:45 a.m.; that from there the phone was moved to the vicinity of the Yeadon industrial park at 6250 Baltimore Pike at approximately 1:53 a.m. and returned to the vicinity of Alexander's Philadelphia residence just after 2:00 a.m.  The data also show that the phone returned to the vicinity of the Yeadon industrial park at approximately 2:53 a.m. and then just after 3:06 a.m. traveled back to Alexander's residence.  D.I. 305 at 895–917; Gov't Trial Ex. 133; Gov't Trial Ex. 265.  Security camera footage introduced at trial placed Burton-Roberson's Jeep at the Yeadon industrial park at approximately 2:55 a.m. on July 21, 2021 and showed two individuals walking with a flashlight from the hill where the Victim had been executed.  Gov't Trial Ex. 100A.  Data from Burton-Roberson's cell phone introduced at trial showed that the flashlight on the phone was used at this time.  D.I. 304 at 577.  A rational juror could infer from these data and Salhuddin's testimony that Burton-Roberson and Alexander returned to the scene of the killing to look for a missing suppresser.[3]

---

[3] The government says in its briefing that "sure enough, when the [V]ictim's body was found the next day, there was no suppressor found next to him." D.I. 371 at 12.  It did not, however, cite, and I was not able to find, record evidence that "no

13

- Derius Fleming testified that as of July 21, 2021 he had a mailing address of 808 North Glover Street, Baltimore, Maryland; that Alexander's father, Kendall Alexander, lived at that time about a block away; that on July 21, 2021 he was in the residence of Alexander's father; when Burton-Roberson arrived and told Kendall Alexander he was there to "hide out"; that Fleming helped Burton-Roberson clean the shoes Burton-Roberson "did the murder in" and helped him clean a Jeep that had "spots" that "might have looked like blood"; that Burton-Roberson gave Kendall Alexander that day an assault rifle concealed in foam in a speaker in the Jeep; that Fleming took photographs of the assault rifle that day; and that Fleming used the rifle three months later to commit a bank robbery with Kendall Alexander in North Carolina. D.I. 306 at 1079–87, 1096.

- Data from Fleming's phone introduced at trial confirm that the phone was used to photograph an assault rifle twice on July 21, 2021—at 2:31 p.m. and 8:17 p.m. The government also introduced at trial enhancements of those photos that establish that the rifle in question was manufactured by Aero Precision and that the last three digits of its serial number are 604. Gov't Trial Ex. 196A; D.I. 305 at 1003–04; Gov't Trial Ex. 200; *see also* Gov't Trial Ex. 211; D.I. 305 at 971–72.

- Data from Alexander's phone introduced at trial show that the phone was used on the morning of July 21,

suppressor [was] found" next to or near the Victim. It is true that there was no record evidence that a suppresser *was* found at the industrial park. But there was no questioning of a witness by the government to establish the universe of items that were found by the police at the industrial park, and therefore I do not think it would be reasonable to draw an inference that Burton-Roberson and Alexander found the suppresser. That said, as noted above, there was record evidence from which a rational juror could conclude that Alexander and Burton-Roberson went back to the industrial park to look for the missing suppressor.

14

2021 to text Burton-Roberson's phone the address 808 North Glove st Baltimore, MD 212025." Gov't Trial Ex. 265 at 87.

- Testimony from Zackary Hagler, a task force officer on the FBI's Violent Crime Task Force in Charlotte, North Carolina and FBI Special Agent Stephen Powell confirmed that Fleming and Kendall Alexander were arrested approximately ten minutes after robbing a bank in Charlotte on October 15, 2021; that surveillance video of the robbery confirmed that one of the robbers had an assault rifle; and that in the car in which Alexander and Fleming fled from the robbery, law enforcement found an assault rifle manufactured by AeroPrecision with the serial number M4-0208604. D.I. 305 at 958–76, 985–86, 1002–03; Gov't Trial Exs. 211, 212. An ATF Form 4473 introduced at trial shows that that rifle was purchased by Antoinette Branch on July 15, 2021— six days before the Victim was shot. Gov't Trial Ex. 205. Two law enforcement witnesses testified that Alexander's girlfriend was named Antoinette Branch and that Branch and Alexander lived together at a known address in Philadelphia. D.I. 304 at 535, 541, 614–15; D.I. 306 at 1130–31. One of those witnesses testified that Branch went by the nickname "Storm" and identified her in a photograph. D.I. 304 at 532, 535, 615; Gov't Trial Ex. 265 at 25. Bultes-Ramirez testified that Alexander and a woman she knew as "Storm," whom Bultes-Ramirez also identified in a photograph, were dating at the time of the crime in July 2021. D.I. 303 at 149–50; Gov't Trial Ex. 267. Pennsylvania DMV records introduced at trial for an Antoinette Michele Branch with the same date of birth and driver's-license number listed on the Form 4473 introduced at trial identify Branch's address as the known Philadelphia address where Alexander lived with his girlfriend. *See* Gov't Trial Exs. 205, 276; D.I. 304 at 541, 1130–31.

15

Based on this evidence, a rational juror could conclude that Alexander, in his capacity as the leader of his Crips gang, gave Burton-Roberson permission to kill the Victim, had his girlfriend buy the assault rifle used to kill the Victim, provided Burton-Roberson with that rifle, and participated in the kidnapping and execution of the Victim.

## C.

Finally, Alexander argues that because the Indictment makes no mention of a cell phone, "[t]he government's introduction of the use of a cellphone as a basis for an instrumentality of interstate commerce was an impermissible constructive amendment" of the Indictment. D.I. 364 at 9. Because Alexander did not raise this argument before his posttrial motion, I review it for plain error. *See United States v. Vosburgh*, 602 F.3d 512, 531 (3d Cir. 2010).

"An indictment is constructively amended when, in the absence of a formal amendment, the evidence and jury instructions at trial modify essential terms of the charged offense in such a way that there is a substantial likelihood that the jury may have convicted the defendant for an offense differing from the offense the indictment returned by the grand jury actually charged." *United States v. Daraio*, 445 F.3d 253, 259–60 (3d Cir. 2006). No constructive amendment of the Indictment occurred here.

16

The Indictment charged the defendant with using instrumentalities of interstate commerce in both counts. It did not identify what those instrumentalities were. (The Indictment alleged that the Jeep was used to transport the Victim from Delaware to Pennsylvania, but it did not allege that the Jeep (or anything else) was an instrumentality of interstate commerce.) Thus, the government could not be said to have modified an essential term—i.e., an element—of the crimes charged in the Indictment when it argued at trial that the cellphone at issue satisfied the interstate commerce instrumentality element of those crimes. *See Vosburgh*, 602 F.3d at 534 (holding that an "error would not have created a constructive amendment of the indictment, because it would not modify *the elements* of the crime charged") (emphasis added) (internal quotation marks and citation omitted); *see also Mathis v. United States*, 579 U.S. 500, 504 (2016) (defining "elements" as "the constituent parts of a crime's legal definition" and "the things the prosecution must prove to sustain a conviction" and distinguishing them from "facts," which are "mere real-world things—extraneous to the crime's legal requirements") (internal quotation marks and citations omitted). "[T]he specific *means* used by a defendant to effect his or her crime does not constitute an 'essential element' of the offense and, therefore, proof of specific means apart from those charged in the indictment does not constructively amend the indictment." *United States v. D'Amelio*, 683 F.3d 412, 422 (2d Cir. 2012) (emphasis in the original).

17

Accordingly, neither the introduction of the cell phone evidence at trial nor the government's argument that the cell phone constituted an instrumentality of interstate commerce constituted a constructive amendment of the Indictment.

NOW THEREFORE, at Wilmington on this Twenty-seventh Day of July in 2026, it is HEREBY ORDERED that Defendant's posttrial motion for a judgment of acquittal or a new trial (D.I. 364) is DENIED.

_____
CHIEF JUDGE